**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| AGIS SOFTWARE DEVELOPMENT LLC, | § | Case No. 2:19-cv-00361-JRG |
| | § | |
| Plaintiff, | § | **JURY TRIAL DEMANDED** |
| | § | |
| v. | § | ████████████ |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**PLAINTIFF AGIS SOFTWARE DEVELOPMENT LLC'S SUR-REPLY**
**IN FURTHER OPPOSITION TO DEFENDANT GOOGLE LLC'S RE-FILED 12(B)(3)**
**MOTION TO DISMISS FOR IMPROPER VENUE (DKT. 255)**

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.      Google's GGC Servers Demonstrate Venue is Proper Over Google ................................. 1

II.     Google's Flower Mound Facility is a Regular and Established Place of Business of Google ........................................................................................................................... 4

III.    The ILA Facilities are Regular and Established Places of Business of Google ................ 8

IV.     The Best Buy Locations Demonstrate Venue is Proper........................................................ 9

V.      In the Alternative, Transfer to the WDTX is Warranted .................................................. 10

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Google*,
  949 F.3d 1338 (Fed. Cir. 2020)...........................................................................*passim*

*Int'l Techs. & Sys. Corp. v. Samsung Elecs. Co.*,
  2018 WL 4963129 (C.D. Cal. June 22, 2018) .............................................................9

*Personalized Media Commc'n, LLC v. Google LLC*,
  No. 2:19-cv-00090, Dkt. 291 (E.D. Tex. July 30, 2020) .................................*passim*

*Seven Networks*, *LLC v. Google LLC*,
  315 F. Supp. 3d 933 (E.D. Tex. 2018)........................................................................2

*In re Volkswagen*,
  2022 WL 697526 (Fed. Cir. Mar. 9, 2022)............................................................4, 7

**Statutes**

28 U.S.C. § 1400(b) ................................................................................................1, 2, 3

**Other Authorities**

Restatement (Third) of Agency § 3.05 cmt. ...................................................................2

Venue is proper over Google pursuant to 28 U.S.C. § 1400(b). As submitted, the GGC servers, Google's Flower Mound facility, Google's ILAs, and the Best Buy locations are within this District, and establish that Google maintains numerous regular and established places of in this District. Google's attempts to disavow its connections to this District by alleging that it purportedly does not provide the level of control necessary to find an agency relationship are contradicted by the discovery provided by Google, including agreements, testimony from its witnesses, and Google's representations to the public.

AGIS had requested venue discovery in its opposition to Google's initially-filed motion to dismiss for improper venue. AGIS has repeatedly requested additional discovery because Google's conduct in other cases reveals that it had relevant, discoverable information within its possession that it did not produce to AGIS in this case. This includes discovery regarding the GGC servers, Google's Flower Mound Facility, ILAs within this District, and Best Buy locations. Google's allegations that AGIS "relies on mostly the same venue grounds and same evidence" are not true. Dkt. 320 at 2. AGIS submitted the evidence produced by Google in support of its arguments regarding GGC servers, Google's Flower Mound facility, and the ILA facilities. The Best Buy agreements and documents were produced for the first time by Google on March 2, 2022, despite Google's initial motion having been filed in 2020. Nonetheless, AGIS submits that the discovery produced by Google contradicts its allegations regarding improper venue.[1]

## I.    Google's GGC Servers Demonstrate Venue is Proper Over Google

Google again relies on the erroneous conclusion that the Federal Circuit's decision in *In re Google* is determinative of whether the GGC servers can support venue over Google in the instant

---

[1] AGIS notes this Court noted Google's "recitals raise serious questions about the candor of Google and its counsel with the Circuit Court and serious questions about their good-faith compliance with their discovery and disclosure obligations before the trial court." *Personalized Media Commc'n, LLC v. Google LLC*, No. 2:19-cv-00090, Dkt. 291 at 5 (E.D. Tex. July 30, 2020) ("*PMC*").

case. Dkt. 320 at 1. AGIS has submitted that the Federal Circuit in *Google* held "under the second *Cray* factor, a 'place of business' generally requires an employee or agent of the defendant to be conducting business at that place." 949 F.3d 1338, 1344 (Fed. Cir. 2020). The Court stated that it was insufficient to show that the employees of the ISPs satisfied the requirement based on the limited record before it, it *did not* foreclose the possibility that additional discovery could lead to a different result or that a "machine," such as the GGC servers, or even Google's end-users, may be agent(s) of Google to sufficiently satisfy § 1400(b). *Id.* at 1347.[2] Nonetheless, the *Google* Court did not hold that a human agent is required. *Id.* at 1347. The GGC servers satisfy the agency requirement, where Google deploys the GGC servers to act in Google's interests and on Google's behalf to carry out Google's *core business* of organizing, storing, and producing information to customers in this District. Dkt. 294 ("Resp.") at 8-9.[3]

Google does not dispute the servers are still located in this District. Dkt. 320 ("Reply") at 2-3. While Google alleges its servers were deactivated, as submitted, local node are "filled on a read-through basis when content is requested by the end user." Resp. at 9. Further, Google does not allege the GGC servers are still functioning as part of Google's network infrastructure to carry out Google's core business of "the actual producing, storing, and furnishing [information] to customers." Reply at 2-3; *Google*, 949 F.3d at 1346. This is confirmed by the testimony of Google's witness, ████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[2] "To be clear, we do not hold today that a 'regular and established place of business' will always require the regular presence of a human agent, that is, whether a machine could be an agent." *Id.* at 1347; *id.* at 1347-48 (Wallach, J., concurring).

[3] Restatement (Third) of Agency § 3.05 cmt. b ("Actions taken by computers and other machines, without immediate direction, can bind the party who chose to transact via computer."); *see also Seven Networks*, *LLC v. Google LLC*, 315 F. Supp. 3d 933, 964 (E.D. Tex. 2018) ("Any reading of the statutory requirements of § 1400(b) that inserts an extra statutory requirement of human-centric activity at the 'regular and established place of business' necessarily renders this express [ATM] exemption superfluous.").

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

In addition, while Google alleges maintenance or repair on the GGC servers "makes no sense" because the GGC servers were allegedly deactivated, Google does not dispute the servers *are located* in the District. Further, it is undisputed Google's agreements contemplate in-person maintenance. Resp. at. 9-10. In addition to these maintenance provisions, Google's agreements provide *Google* will provide remote support services and network connections require ongoing support from Google employees. *Id.* at 10. These support services include not only maintenance, but also services such as installation materials and technical support, software updates, access to public internet for exchange of data, and sending traffic. *Id.*

Google's allegation the Federal Circuit has already rejected the "ATM Exception for Venue Purposes," is false. Reply at 3. To the contrary, the Court merely held it "do[es] not see why this amendment . . . should alter our analysis."[5] As submitted, Google's GGC servers are not automated teller machines and there is no authority exempting the Google GGC servers from being "regular and established place[s] of business" for the purposes of venue. Resp. at 11-12. The GGC servers are regular and established places of business of Google in this District.

---

[4] AGIS notes that ███████████ declaration in this case, which is identical to the declaration submitted in *Uniloc 2017 LLC v. Google LLC*, states the servers have been drained, ███████████████████████████████████
██████████████ ■ ████████████████████████████████████████████████
████████████████████████████████████████████████████████████ Thus, Google's GGC servers are still functioning to carry out Google's core business on behalf of Google and at Google's direction, and thus satisfy § 1400(b). Resp. at 9-11.

[5] *Google*, 949 F.3d at 1345, 1347 ("To be clear, we do not hold today that a 'regular and established place of business' will always require that the regular presence of a human agent, that is, whether a machine could be an 'agent.'").

## II.     Google's Flower Mound Facility is a Regular and Established Place of Business of Google

As a preliminary matter, Google does not dispute the ISA and SOW with ███ remains in effect as of the date of the Complaint, and ███ has provided repair, refurbishment, warehousing, and transport services on behalf of Google since 2017. Google's employees and agents conduct extensive and regular activities at the Flower Mound Facility and Google's employees have repeatedly visited the Flower Mound Facility to conduct, for example, operational reviews and various activities. Resp. at 16-17. Google concedes AGIS's arguments parallel the Court's decision in *PMC*. As held by the *PMC* Court, Google's Flower Mound Facility is a regular and established place of Google. Google's allegation the *PMC* decision should be revisited in view of *In re Volkswagen* is unpersuasive.

First, as held by this Court in *PMC*, "the existence of an agency relationship is governed by Federal Circuit law."[6] The Court also noted the Federal Circuit stated "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* In *PMC*, the Court stated "Google has the right to, and does—in fact—direct and controls CTDI's actions within the Google Secured Area in Flower Mound," and "Google prescribes how to perform each step of CTDI's services and retains control of the actions CTDI undertakes for Google."[7]

Second, "Google authorizes CTDI to act on its behalf" and "CTDI consents to act on Google's behalf." *Id.* at 8. Google "tells its customers to send their devices to 'us'—*i.e.*, Google" and "'Google system logic' also directs customers to send their particular phones to the Flower

---

[6] *PMC,* at 5 ("As the Federal Circuit recently recounted, '[t]he essential elements of agency are (1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act.").

[7] *Id.* at 6 ("In short, Google controls and oversees virtually every aspect of how CTDI performs its services, including how it receives, diagnoses, repairs, warehouses, packages, and ships the Google devices.").

Mound Facility for repairs." *Id.* CTDI agrees to provide the Services provided in the SOW and consents to "refurbish" and "ships" Google's products on behalf of Google, and pursuant to Google's instructions. *Id.* at 8-9. The Court held "CTDI is Google's agent." *Id.* at 9.

The Court also stated, contrary to Google's allegations, CTDI's activities are not "ancillary" to Google's business. Reply at 5. The *PMC* Court stated the "maintenance activities" in *In re Google* was "maintaining equipment (servers)," where in *PMC*, "the repairs, refurbishing, warehousing, and transport services provided flow directly to Google's customers and relate entirely to Google phones, Google Home devices, and other Google hardware which are clearly part of Google's business." *PMC* at 9 n.4. AGIS has submitted these activities are "non-ancillary repair, warehousing, and refurbishing services." Resp. at 2. Further, Google has entered into a Vendor Master Inventory Agreement with ████ ("Inventory Agreement") which discloses ████ ████████████████████████████████████████████████████ which is never addressed by Google. Reply at 5. Under the Inventory Agreement, ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Resp. at 21. The direct provision of Google's products by ████ to Google's customers and end-users is not *ancillary* to Google's business. *See supra* 5 (citing *PMC*).

The Inventory Agreement similarly demonstrates Google retains interim control over ████. For example, Appendix I of the Inventory Agreement discloses specific requirements as to how ████ will provide services to Google. *See generally* Ex. 20 at Appendix I. This includes the warranties and undertakings in ████████████████████████████████



███ receives inbound shipments from Google's distribution centers and Google suppliers, where Google determines the "point of origin, frequency of shipments and quantity of Products to be delivered to ███ in each shipment." *Id.*[8]

Appendix I also discloses the method by which ███ warehouses and manages inventory of the Google products, including storing fully or partially palletized Google products ███

███ With respect to ███ the Vendor Agreement requires upon receipt of a consumption order, ███

---

[8] The Inventory Agreement also requires Google will notify ███

████████ The *PMC* Court delineated provisions in the SOW delineate the interim instructions. *See PMC*, at 6-8. Similarly, AGIS noted the interim instructions provided by Google to ████████ These instructions include ████████████████████████████████████ ████████████████████████████ in the Flower Mound Facility. *See id.* at 19-20.

Google's reliance on the Federal Circuit's decision in *In re Volkswagen* is unavailing. Reply at 6-7. Notably, the Petitioner in *Volkswagen* submitted the Tex. Occ. Code Ann. § 2301.476(c)(2), "prohibits distributors from 'operat[ing] or control[ing]' car dealerships in Texas." 2022 WL 697526, at *6 (Fed. Cir. Mar. 9, 2022). While the Federal Circuit did not reach whether the agreements violate Texas law, it found the contractual provisions "fail to give Petitioners 'interim control' over either the dealerships' car sales or warranty work." *Id.*[12] While the *Google* Court determined such "additional, specific control by Google may have been 'suggestive of an agency relationship' with respect to those tasks," because the "one-off installations could not be considered 'regular and established,'" the ISP were not Google's agents. In contrast, the provision of Google's products by ████ are not "one-off" activities. Rather, Google sets forth specific, step-by-step instructions in how ████ provides the Google products to Google's customers and end-users. *See supra* 6-7.[13]

Lastly, the Flower Mound Facility is a place *of Google*.[14] The *PMC* Court held "Google

---

[10] *See* Resp. at. 18-19 ("Google reserves its right of interim instruction . . .").

[11] AGIS disagrees with Google's allegation that "AGIS does not dispute that the 'Google Secured Area' is not physically separate from other areas," where AGIS has explicitly pointed to the SOW which discloses "Google further specifies that the Google Secured Area must 'have walls from floor to ceiling' and 'be fully separate from other operations.'" Resp. at 20. Further, the Vendor Agreement has requirements that ████ cannot use Google provided infrastructure, equipment, or material to provide services to any other ████ customers. *Id.* at 21.

[12] The Federal Circuit also noted that "unlike *Google II*'s maintenance and installation provisions, there are no 'step-by-step' instructions from Petitioners that dealerships must follow." *Id.* at *7.

[13] The *Volkswagen* Court stated that the "parties to the franchise agreement disclaim an agency relationship" is not dispositive. 2022 WL 697526, at *7 ("[I]t is well established that parties' statements in a contract are not dispositive as to the existence of an agency relationship."); *see also PMC* at 10.

[14] Google's allegations that AGIS relies *only* on the *PMC* order is misleading and ignores numerous citations to Google's SOW and other agreements as identified by AGIS. Resp. at 21-23.

both establishes and ratifies the Flower Mound Facility as its place of business," and the SOW specifies the Flower Mound Facility as the location by which Google services are provided and requiring a Google Secured Area. *PMC* at 11.[15] The *PMC* Court cited to Google's own support webpages state Google is the provider of repair services in the United States and requiring CTDI to "use Google-branded packaging for the repair phones to ship back to customers." Resp. at 22. Further, although stored and warehoused at the Flower Mound Facility, Google retains title to the Google products until "completion of the fulfilment of such Consumption Order by ███." This was confirmed by testimony from ████████.[16] Accordingly, the Flower Mound Facility is a regular and established place *of* Google.

## III.   The ILA Facilities are Regular and Established Places of Business of Google

Google's fiber and ILA facilities and hardware further established Google maintains regular and established places of business in this District.[17] Google does not dispute it leases these facilities in at least nine different cities in this District to house the ILAs which are owned and provided by Google.[18] In many of these facilities, Google provides the rack and/or locking cabinets and Google performs site surveys for these facilities. Resp. at 24-25. The ILA facility agreements are not merely "akin to railway tracks through the District," but rather, disclose agreements for "colocation space and/or power."[19]

Google also does not dispute the ILA facilities have been used in Google's business for years and the lease agreements contemplate use for decades. Resp. at 25. Google is not required to

---

[15] "Google customers believe they are sending their Google devices to Google to be repaired—indeed, they 'ha[ve] no idea that [the] CTDI Facility is even working on this." *PMC* at 11.

[16] ████████████████████████████████████████

[17] With respect to Google's arguments that the agreements for Google's ILAs disclaim agency (Reply at 8), *see supra* n.6.

[18] ████████████████████████

[19] Ex. 26 ("Level 3 will provide to Google Dark Fiber (if applicable) and a license for space and power.").

have an escort to access these ILA facilities. Ex. 16 at 81:22-82:1. In the alternative, employees of the ILA facilities act as agents of Google, where Google delineates the specific responsibilities of the parties, such as LTS Managed Technical Services. *See* Ex. 25.[20] Such activities are at the discretion of Google and Google provides interim control in the provision of these services. Accordingly, the ILA facilities are regular and established places of business of Google.

## IV.    The Best Buy Locations Demonstrate Venue is Proper

The Best Buy locations in this District are sufficient to establish venue is proper over Google. Resp. at 26-27. Google's reliance on the *Samsung* case is misleading and highly distinguishable. In that case, the Court dismissed only one of three Samsung Defendants (Samsung Pay) when the record lacked any evidence of agreements, contracts, employees, agents, or control as to Samsung Pay, and Plaintiff relied on a theory of imputation to assert proper venue over Samsung Pay, while the remaining Samsung Defendants conceded to proper venue. *Int'l Techs. & Sys. Corp. v. Samsung Elecs. Co.*, 2018 WL 4963129, at *8, *6 (C.D. Cal. June 22, 2018). Here, Plaintiff does not rely on any theory of imputation for Google, and the record is sufficient to demonstrate the leased retail spaces are "regular and established place of business" of Google. In particular, Google's contract for specific retail space to market and sell Google products at physical stores in the District and Google's agreement to retain significant control over the leased physical space. As submitted, Google has contracted for the use of physical space in Best Buy locations, Google retains significant control over the space, and appoints Best Buy as an "authorized dealer" of Google's products. Resp. at 26. Google exercises instructions regarding the marketing and

---

[20] ████████████████████████████████████████████

promotional activities, and Google has the right to staff its own employees at the Vendor Fixtures for the purpose of providing product demonstrations to potential customers and assisting with the sale of the products. *Id.* Google also retains the right to dictate the placement of Google products, demonstrate products and determine *only* Google products may be displayed on its Vendor Fixtures. *Id.* Further, publicly-available information discloses Best Buy hires *Google-specific* sales experts and personnel. *See, e.g.*, Ex. 34.[21] Accordingly, the Best Buy locations are regular and established places of business of Google.

## V.      In the Alternative, Transfer to the WDTX is Warranted

AGIS submits the venue is proper in this District. In the event Court finds transfer is warranted, AGIS respectfully requests this action be transferred to WDTX, Waco Division, where venue over Google is undisputed. Resp. at 28-30. The WDTX is a more convenient forum than the NDCA. *Id.* Google has significant connections to the WDTX, including three major offices and a $600 million data center in Midlothian, Texas, employees, and access to sources of proof. Resp. at 28-30. AGIS's own headquarters and data center, including its sources of proof, are located nearby in Marshall. Further, AGIS's sister entity, AGIS, Inc., maintains an office in WDTX with relevant sources of proof. Lastly, AGIS's own witnesses would find it more convenient to travel to Texas than California and, therefore, the convenience of litigating in WDTX far outweighs litigating in NDCA. Resp. at. 28-30.

Accordingly, AGIS requests denial of Google's Motion in its entirety. In the event the Court finds transfer is warranted, AGIS respectfully requests the Court transfer this case to WDTX, Waco Division, where venue over Google is undisputed.

---

[21] With respect to Google's arguments regarding the "no-agency" clause (Reply at 10), *see supra* n.6.

Dated:  March 28, 2022

Respectfully submitted

*/s/ Vincent J. Rubino, III*
Alfred R. Fabricant
NY Bar No. 2219392
Email: ffabricant@fabricantllp.com
Peter Lambrianakos
NY Bar No. 2894392
Email: plambrianakos@fabricantllp.com
Vincent J. Rubino, III
NY Bar No. 4557435
Email: vrubino@fabricantllp.com
Enrique W. Iturralde
NY Bar No. 5526280
Email: eiturralde@fabricantllp.com
**FABRICANT LLP**
411 Theodore Fremd Avenue,
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

Samuel F. Baxter
State Bar No. 01938000
Email: sbaxter@mckoolsmith.com
Jennifer L. Truelove
State Bar No. 24012906
Email: jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 E. Houston Street, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

***ATTORNEYS FOR PLAINTIFF AGIS
SOFTWARE DEVELOPMENT LLC***

11



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 28, 2022, all counsel of record are being served with a copy of this document via electronic mail.

_/s/ Vincent J. Rubino, III_
Vincent J. Rubino, III