IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| AGIS SOFTWARE DEVELOPMENT LLC, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 2:19-CV-00361-JRG |
| GOOGLE LLC, | § § § § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Google LLC's ("Google") Re-Filed Rule 12(b)(3) Motion to Dismiss for Improper Venue (the "Motion"). (Dkt. No. 255). Having considered the Motion, the related briefing, and the relevant authorities, the Court concludes that the Motion should be **DENIED**.

### I.   BACKGROUND

On November 4, 2019, AGIS Software Development LLC ("AGIS") filed a multi-patent complaint against Google, alleging infringement of U.S. Patent Nos. 8,213,970; 9,408,055; 9,445,251; 9,467,838; 9,749,829; and 9,820,123 (collectively, the "Asserted Patents"). (Dkt. No. 1). The same day, AGIS filed related lawsuits against Waze Mobile Limited ("Waze") (Case No. 2:19-cv-359) and Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung") (Case No. 2:19-cv-362).

Google initially filed its Motion to Dismiss for Improper Venue on February 18, 2020. (Dkt. No. 25). On February 9, 2021, the Court stayed the above-captioned case, pending *ex parte* reexaminations instituted as to all Asserted Patents. (Dkt. No. 219; Dkt. No. 251).

Following the *ex parte* reexaminations, the Court lifted the stay on January 28, 2022. (Dkt. No. 232). Given that facts relevant to the Motion were discovered during the pendency of the stay, the Court found that additional briefing would be beneficial, denied without prejudice Google's Motion to Dismiss for Improper Venue, and granted Google leave to refile the same. (Dkt. No. 251 at 2). Google refiled the present Motion on February 25, 2022. (Dkt. No. 255). In the Motion, Google contends that venue is improper in the Eastern District of Texas (the "EDTX") and requests the Court to either dismiss this action for improper venue or transfer it to the Northern District of California. (*Id.* at 35).

Google is a Delaware corporation and maintains its principal place of business in Mountain View, California. (Dkt. No. 1 at 1). AGIS is a limited liability company organized in Texas and maintains its principal place of business in Marshall, Texas. (*Id.*).

## II.   LEGAL STANDARD

A party may move to dismiss an action for "improper venue." FED. R. CIV. P. 12(b)(3). "Once a defendant raises a 12(b)(3) motion to dismiss for improper venue, the burden of sustaining venue lies with the plaintiff." *ATEN Int'l Co., Ltd. v. Emine Tech. Co., Ltd.*, 261 F.R.D. 112, 120–21 (E.D. Tex. 2009) (citation omitted). A plaintiff may carry its burden by presenting facts, taken as true, that establish venue. *Id.* The Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:13-cv-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)).

"[V]enue facts are to be examined as of the date the suit is filed." *Personal Audio, LLC v. Google, Inc.*, 280 F. Supp. 3d 922, 924 (E.D. Tex. 2017).[1] The Federal Circuit has

---

[1] AGIS filed suit against Google for patent infringement on November 4, 2019. The Inbound Services Agreement (the "ISA") and Statement of Work No. 463889 (the "SOW") between Google and Communications Test Design

emphasized that "each case depends on its own facts" and "no one fact is controlling." *In re Cray Inc.*, 871 F.3d 1355, 1362, 1366 (Fed. Cir. 2017). If venue is improper, the Court must dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

In an action for patent infringement, venue is controlled by 28 U.S.C. § 1400(b), the patent venue statute. Pursuant to 28 U.S.C. § 1400(b), "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Under the residency requirement, the Supreme Court held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1517 (2017). AGIS does not attempt to argue that venue is established under the residency requirements of 28 U.S.C. § 1400(b). *Id.* at 1521. Therefore, to establish venue, AGIS must present facts that, if taken as true, show that Google has a regular and established place of business in the EDTX. Under the patent venue statute, a "regular and established place of business" must be (1) "a physical place in the district"; (2) "regular and established"; and (3) "the place of the defendant." *In re Cray*, 871 F.3d at 1360.

### III.   DISCUSSION

In its Motion, Google contends that venue is improper and that the Court's previous Order in *Personalized Media Commc'n, LLC v. Google LLC*, No. 2:19-cv-90, Dkt. No. 291 (E.D. Tex. July 16, 2020) ("*PMC*")[2] should be revisited or abrogated in light of the Federal Circuit's

---

Inc. ("CTDI"), discussed herein, became effective on August 15, 2017, and May 15, 2018, respectively. Both were in effect at the time AGIS filed its complaint. (Dkt. No. 294-13 at 27; Dkt. No. 294-15 at 15; Dkt. No. 294-19 at 2, 6 (terminating the ISA and SOW on October 22, 2020)).

[2] The Court notes that Google and CTDI terminated the ISA and SOW approximately three months after this Court's July 16, 2020 decision in *PMC*, which found venue proper over Google based on said agreements. The agreements

decision in *In re Volkswagen*, 28 F.4th 1203 (Fed. Cir. 2022).[3] (Dkt. No. 255 at 9; Dkt. No. 320 at 4). In response, AGIS argues that Google has a regular and established place of business in the EDTX based on (1) Google Global Cache servers; (2) CTDI's facility at Flower Mound within this District (the "Flower Mound Facility"); (3) the locations of fiber optic lines and in-line amplifiers necessary for the function of Google Fiber; and (4) Google's leased retail spaces in Best Buy stores. (Dkt. No. 294 at 6).

For the reasons previously discussed in *PMC*, "[t]his Court finds that venue is proper in the [EDTX] based on the Flower Mound Facility" and that the Federal Circuit's decision in *In re Volkswagen* bolsters this Court's previous findings. Accordingly, the Court need not address AGIS's other arguments.

### A. Physical Place in the District

Under the first *Cray* factor, "there must be a physical place in the district." *In re* Cray, 871 F.3d at 1360. The place need only be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.*

The parties do not dispute the first *Cray* factor. (*See* Dkt. No. 255; Dkt. No. 294). The Flower Mound Facility is located in the EDTX at 700 Lakeside Parkway, Flower Mound, Texas 75028. (Dkt. No. 255 at 11–12; Dkt. No. 294 at 20; Dkt. No. 294-13 at § 6.2). On August 15, 2017, Google and CTDI entered into the ISA, and thereafter, the SOW on May 15, 2018. (Dkt. No. 294-13 at 27; Dkt. No. 294-15 at 15). The ISA provides that "[t]he terms in an SOW will take precedence over conflicting terms in [the ISA] only for the Services and Deliverables

---

were terminated eight months before the SOW's pre-defined "End Date." (*See PMC*, Dkt. No. 257); (*See also* Case No. 2:19-cv-361, Dkt. No. 294-13 at 2, 26 (establishing the "SOW End Date" as May 15, 2021)).

[3] While Google requests that this Court revisit its prior decision concerning similar venue issues in *PMC*, the Court notes that the Federal Circuit's denial of Google's petition for a writ of mandamus concerning the very *PMC* decision that Google challenges herein is noticeably absent from Google's Motion and subsequent briefing. (*See In re Google*, No. 2020-144, Dkt. No. 35).

identified in that SOW." (Dkt. No. 294-15 at 14). Pursuant to the SOW, CTDI must provide repairing, refurbishing, and warehousing services for Google devices. (*See id.* at §§ 6.1, 6.3). The SOW also provides for a "Google Secured Area," and defines its requirements. (*Id.* at 5). The SOW requires that the Google Secured Area have "walls from floor to ceiling" and "be fully separate from other operations and other third[-]party products, as determined by Google, at [CTDI's] sites." (*Id.*). The Google Secured Area must also "have video monitoring and recording of all access points, as well as badge access limited solely to [CTDI] employees authorized to work with Google products." (*Id.*). Additionally, the location of the Flower Mound Facility cannot change unless Google agrees to move it in writing. (*Id.* at § 6.2).

Here, the Google Secured Area is a "physical, geographical location" in the EDTX from which Google conducts its business. (*See also PMC*, Dkt. No. 257 at 3–4). Google has a defined place and sets out the physical specifications for its exclusive and separate area within the Flower Mound Facility. Google restricts use to its aptly named Google Secured Area to services solely performed for its products, and the Google Secured Area excludes all "other operations and other third[-]party products." (*Id.*). Google establishes certain safeguards such as "video monitoring and recording of all access points" while also limiting access to the area to CTDI employees who are "authorized to work with Google products." (*Id.*). Google also explicitly retains control over the exclusiveness of the Google Secured Area as well as its location. Accordingly, the Google Secured Area of the Flower Mound Facility is a physical place within the EDTX that satisfies the first *Cray* factor.

### B. Regular and Established Place of Business

Under the second *Cray* factor, a "regular and established place of business" requires "the regular, physical presence of an employee or other agent of the defendant conducting the

defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d at 1345. The Federal Circuit reiterated that "[t]he essential elements of agency are (1) the principal's right to direct or control the agent's actions[;] (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf[;] and (3) the consent by the agent to act." *In re Volkswagen*, 28 F.4th at 1208–09 (quoting *id.*). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *In re Google*, 949 F.3d at 1345–46 (quoting Restatement (Third) of Agency § 1.01 cmt. f(1)).

Recently in *In re Volkswagen*, relying on *In re Google*, the Federal Circuit noted that for venue, an "agency relationship requires [that] 'the principal have the right throughout the duration of the relationship to control the agent's acts.'" *In re Volkswagen*, 28 F.4th at 1209 (quoting *Pac. Gas & Elec. Co.*, 838 F.3d at 1359). The Federal Circuit distinguished the necessary "interim control," which provides the interim right to give step-by-step instructions to the purported agent, from agreements that merely "impose constraints" or "set[] standards . . . for acceptable service quality." *Id.* at 1209 (quoting Restatement (Third) of Agency § 1.01(f)(1)). The Federal Circuit explained that "setting standards in an agreement for acceptable service quality does not of itself create a right of control." *Id.*

The Court thus considers whether Google's employees regularly conduct business at the Flower Mound Facility, and whether—in light of *In re Volkswagen*—CTDI serves as Google's agent regularly conducting Google's business for the purposes of venue under Section 1400(b).

### 1. Regular, Physical Presence of Google Employees

Google argues that it does not have a regular and established place of business at the Flower Mound Facility because only "six Google employees have . . . visited the Flower Mound

6

[F]acility[,]" and "[t]hose visits were for the purpose of reviewing contracts, not directing the day-to-day activities of CTDI." (Dkt. No. 255 at 12).

AGIS contends that "Google admits that [its] employees have repeatedly visited the Flower Mound [F]acility to 'conduct some operational reviews' of CTDI's work, including to check up on 'key performance indicators,' and to 'discuss the commercial terms of the contract between Google and CTDI.'" (Dkt. No. 294 at 21–22). AGIS further contends that Google employees regularly visited the Flower Mound Facility over the period of the Google-CTDI contractual relationship. (*Id.* at 22).

The Court finds that AGIS has met its burden to plead facts that, if taken as true, show the regular, physical presence of Google employees in this District conducting Google's business. Google maintains a regular and established place of business at the Google Secured Area of the Flower Mound Facility by the regular, physical presence of its employees. Throughout the duration of Google and CTDI's relationship, Google employees have regularly visited the Flower Mound Facility multiple times. (Dkt. No. 294-12 at 167:21–174:1). Google alleges that only six Google employees visited the Flower Mound Facility; however, the record reflects that Google did "not actively track[] or monitor[]" the total number of Google employees travelling to the Flower Mound Facility and that "many [Google] employees visited" the facility to carry out multiple duties integral to the ISA and SOW. (Dkt. No. 255 at 12; Dkt. No. 294-12 at 171:20–173:3 (deposition testimony of Google Program Manager Prem Pandian)). Although not dispositive, the failure to track and monitor Google employees' visitation to the Flower Mound Facility suggests that the physical presence of such employees within the EDTX was regular and established.[4] The purpose of Google employees' visits to the Flower Mound Facility

---

[4] On a motion to dismiss for improper venue, a plaintiff need only present facts which, taken as true, establish venue. *Langton v. Cbeyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003). The Court "must

included operational reviews of key performance indicators over Google's business of repairing, refurbishing, and warehousing services performed for Google devices. (Dkt. No. 294-12 at 187:22–188:6; Dkt. No. 294-13 at § 6.2). Google employees also visited the Flower Mound Facility to discuss the commercial terms of the contract between Google and CTDI. (Dkt. No. 294-12 at 188:8–12).

Based on the foregoing, the Court finds that Google has a regular and established place of business within the EDTX satisfied by the regular, physical presence of its employees. However, in light of Google's request that this Court revisit its ruling in *PMC*, the Court proceeds to address—and affirm—its decision that Google's agency relationship with CTDI establishes proper venue over Google in this District.

### 2. Regular, Physical Presence of Agents of Google

Google presents various arguments disclaiming any agency relationship between itself and CTDI. (Dkt. No. 255; Dkt. No. 320). Google argues that CTDI lacks the "authority to 'alter the legal relations between the principal and third parties.'" (Dkt. No. 255 at 17; Dkt. No. 320 at 7). Google states that CTDI lacks the "authority to accept service of process on Google's behalf." (Dkt. No. 255 at 23; Dkt. No. 320 at 7). Google contends that CTDI's repair activities are ancillary to Google's business. (Dkt. No. 255 at 22). Google notes that *In re Google* is instructive because "'maintenance activities' that third-party ISPs performed for computer servers 'cannot, standing alone, be considered the conduct of Google's business.'" (*Id.* (quoting *In re Google*, 949 F.3d at 1346)). Finally, Google contends that it has no interim control over

---

. . . resolve all conflicts [of fact] in favor of the plaintiff." *Mayfield*, 2014 WL 978685, at *1. Here, the parties dispute the quantity of the "many" Google employees performing duties at the Flower Mound Facility—with even Google's Program Manager stating that "there are many [Google] employees who go to [the Flower Mound Facility]." (Dkt. No. 294-12 at 170:10–11). Given the nature of the operational reviews and contractual discussions and the quantity of Google employees which must be resolved in plaintiff's favor, the Court finds that AGIS has shown enough to support its contention that Google employees were regularly conducting business at the Flower Mound Facility.

CTDI by comparing provisions between the Google-CTDI agreements and the franchise agreements at issue in *In re Volkswagen*. (Dkt. No. 255 at 19; Dkt. No. 320 at 8, 9).

In response, AGIS notes that several contractual provisions in the SOW provide for Google's interim control over CTDI. For example, AGIS asserts that Google requires CTDI to comply with various reporting requirements. (*See id.*). AGIS also asserts that Google requires CTDI to "appoint an account representative to work with Google on all Service-related issues," "conduct a bi-weekly call with Google" regarding "trends in recurring failures[,]" and identify "allocate[]d [human] resources" for Google. (*Id.* at 22–23; Dkt. No. 294-13 at § 9.1). AGIS argues that Google retains control over CTDI by determining the specifications of the Google Secured Area; determining which products are "qualifie[d] [] for repair"; identifying various security standards, equipment, and software requirements; instructing on how to handle a Returned Product; and "at Google's sole discretion, direct[ing] [CTDI] to purchase materials from a third[-]party vendor on Google's Authorized Vendor List[.]" (*Id.* at 24). AGIS notes Google and CTDI's Vendor Master Inventory Agreement ("VMIA") and contends that provisions of the VMIA demonstrate Google's interim control over CTDI based on specified instructions as to how CTDI is required to maintain Google's products. (*See id.* at 26).

The Court finds, as it did in *PMC* and consistent with the Federal Circuit's guidance in *In re Volkswagen*, that CTDI is Google's agent for the purpose of conducting Google's business in this District because Google provides regular, "step-by-step instructions," directing CTDI's performance of the repairing, refurbishing, warehousing, and packaging services that Google offers to Google customers.[5] Specifically, Google directs and controls CTDI's actions within the

---

[5] *See In re Volkswagen*, 28 F.4th at 1212 (finding venue improper because "there are no 'step-by-step' instructions from [Defendants] that [the alleged agents] must follow when [conducting the Defendants' business].") ; (*cf.* Dkt. No. 294-13 at § 6.10(D) ("[CTDI] may provide Kitting Services . . . **in accordance with Google's instructions**. . . . [CTDI] will kit the components into Fulfillment Product **as per instructions from Google** . . . .") (emphasis

Google Secured Area of the Flower Mound Facility. Section 6.15(a) of the SOW provides that CTDI "shall implement" any "change to the Services requested by Google," so long as the change does not negatively impact CTDI's staffing model, existing systems, or costs in providing the Services. (Dkt. No. 294-13 at § 6.15(A)). Google is given explicit authority to direct and control CTDI's actions. Therefore, Google exercises significant control over CTDI through Section 6.15(A).

Google retains complete, absolute, and exclusive control over the Google Secured Area. As previously noted, Google prescribes the physical specifications, outlining a sole and separate space apart from the Flower Mound Facility. (Dkt. No. 294-13 at 5). Google restricts the Google Secured Area to its products and services and excludes all other operations and third-party products. (*Id.*). Google also maintains security and limits access to certified CTDI employees permitted to follow Google's instructions regarding the work on Google's products occurring within the Google Secured Area. (*Id.*). Finally, only Google possesses the authority to move the Google Secured Area. (*Id.*). Thus, Google maintains absolute control over every aspect of the Google Secured Area.

Further, Google provides step-by-step instructions for all services that it requires CTDI to perform for Google customers as specified in the SOW such as: "[t]ak[ing] receipt of Returned Products . . . Quarantine Services, Capture Services[,] and Sorting Services"; "Part Number Transformation Services"; "Triage Services"; "Data Wipe Services"; "IW Services, OOW Services, SUR Services, Scrap Services, Refurbishment Services and Fulfilment Services in relation to Defective Products (as applicable), Labelling Services"; "Harvesting Services"; "Inventory Procurement and Management Services"; "Warehousing Services"; "Shipping

---

added))). Unlike the agreements at issue in *In re Volkswagen* which merely "imposed constraints" or "set[] standards . . . for acceptable service quality," here—as discussed—Google has and exercises "the right throughout the duration of the relationship to control the agent's acts." 28 F.4th at 1209–10.

Services"; "Report Services"; and "VAS." (Dkt. No. 294-13 at § 6.1). For example, for Receipt-of-Returned-Products services, Google requires CTDI to "take receipt of Returned Products from: (i) Google; (ii) Google's end customers (including enterprise); and/or (iii) Authorized Retailers." (*Id.* at § 6.5). The SOW states, "Each shipment of Returned Product(s) should include a Return Material Authorization number provided by Google ('RMA')." (*Id.*) CTDI must set aside the shipment in a secure location and escalate the issue to Google, "[i]f an RMA is not included with a returned shipment of Returned Products." (*Id.*). Next, CTDI must "report to Google the received number of Returned Products, using the RMA numbers, multiple times during the day via EDI transmission through Contractor's warehouse management software system." (*Id.*). Google requires that for specified products, CTDI must "capture serial number or IMEI upon Google's receipt." (*Id.*). Then, "**[a]fter** [CTDI] takes receipt of Returned Products, [CTDI] will conduct an in-box check of each Returned Product to verify whether any accompanying accessories are included. The accessories or any other materials which do not form part of any incoming Returned Product and which do not have an associated RMA will be quarantined by [CTDI] for disposal or reuse, **as instructed by Google**." (*Id.* (emphasis added)). Google imposes a detailed and strict level of compliance on CTDI for every required service in the SOW. (*See id.* at §§ 6.5–6.14).

To further emphasize Google's interim control over CTDI, this Court previously exemplified various provisions throughout the SOW "affording Google the right to give interim instructions to CTDI" (*See PMC*, Dkt. No. 257 at 6–7):

- "**Google may change the levels of refurbishment at any time** with written notice . . . **[CTDI] will implement such changes.**" (Dkt. No. 294-13 at § 6.9(B));
- "[CTDI] will provide the following OOW Services, **unless instructed otherwise in writing by Google** . . ." (*Id.* at § 6.9(G));

11

- "**Google may, at its sole discretion, direct [CTDI]** to purchase materials from a third[-]party vendor." (*Id.* at § 8.1(D));
- "[CTDI] will generate and apply a label . . . **as directed by Google**." (*Id.* at § 6.10(A));
- "[CTDI] will change the Part Numbers of all the Returned Products (**as directed by Google**)." (*Id.* at § 6.6);
- "**Google may require [CTDI]** to add, remove, or amend any of the above information on labelling." (*Id.* at § 6.10(B));
- "**Google may direct [CTDI]** to warehouse Products at one of its Locations for a specified period of time." (*Id.* at § 6.11(C));
- "The accessories or any other materials which do not form any incoming Returned Product and which do not have any associated RMA will be quarantined by [CTDI] for disposal or reuse, **as instructed by Google**." (*Id.* at § 6.5(A));
- "[CTDI] may provide Kitting Services . . . **in accordance with Google's instructions**." (*Id.* at § 6.10(D));
- "**Google may request [CTDI]** to locate and ship received individual or multiple Product(s) to a specified address." (*Id.* at § 6.11(E));
- "**Upon request, [CTDI] will report to Google** the data wipe outcome . . . [CTDI] will also store and maintain all data wipe records . . . and produce such records **for Google upon request**." (*Id.* at § 6.7(B));
- "[CTDI] will install the latest version of the operating system . . . **as instructed by Google**." (*Id.* at § 6.8(A));
- "[CTDI] will perform basic functionality testing . . . **with instructions provided by Google**." (*Id.*);
- "[CTDI] will mark the Returned Product as IW Product **in accordance with Google's instructions** . . ." (*Id.* at § 6.9(A)). [6]

Additionally, for each service under the VMIA, entered into on March 27, 2017, Google provides interim instruction to CTDI. The VMIA requires CTDI to provide "services" to Google, which include receiving, warehousing, logistics, inventory management, fulfilment to Customer, reporting, VAS (as defined below)[,] and third[-]party transportation management services in the [U.S.]" (Dkt. No. 294-22 at 17). The VMIA generally requires that CTDI

---

[6] The Court finds that these provisions give Google direct interim control over the repairing, warehousing, and refurbishing work that Google requires CTDI to perform for Google customers. These provisions differ from those in *In re Volkswagen*—there, the cited provisions merely placed "various constraints . . . on the [alleged agents] that [were] arguably *related* to [the Defendants' business]." 28 F.4th at 1211 (emphasis added). Here, Google provides step-by-step instructions that CTDI must follow when directly performing the repairing, warehousing, and packaging services that Google offers to its customers for devices such as the Google Pixel smartphone. (Case No. 2:19-cv-361, Dkt. No. 294-13 at §§ 6.8–6.9; Dkt. No. 294 at 16).

"receive, store[,] and replenish full pallets of Google Products in the [Flower Mound] Facility." (*Id.*). For each listed service, Google also provides clear, "step-by-step directions." *In re Volkswagen*, 28 F.4th at 1209 (citing *In re Google*, 949 F.3d at 1346). For example, the VMIA requires CTDI to provide "Product Receipt Services" for Google. First, CTDI must "take receipt of inbound shipment of Products in the Facility from (i) Google distribution centers in the [U.S.] []; and (ii) Google suppliers." (Dkt. No. 294-22 at 17). Second, "Google will notify CTDI . . . of expected Product delivery, upon shipment of the relevant Products." (*Id.*). CTDI will receive notice of "(1) shipment details; (2) carrier identification; (3) carrier tracking number; (4) purchase order number; (5) part number; [and] (6) pallet quantity and identification." (*Id.*). Third, "[p]roducts will be received into the Facility via FTL, LTL, and Parcel carriers based on prior notice to be submitted by Google carriers to CTDL." (*Id.*). Fourth, "[p]roducts should arrive on pallets according to Customer's specifications. (*Id.* at 18). Fifth, "[p]roducts are validated against the applicable Google ASN. In the event of a discrepancy, CTDI and Google will mutually agree on the corrective action required." (*Id.*). Sixth, "[a]fter Products are received in the WMS, such Products will undergo the inspection **process** specified in Section (3) below." (*Id.* (emphasis added)). Not only does Google provide step-by-step direction to CTDI concerning Product Receipt Services, Google also provides step-by-step instruction concerning "the inspection process specified in Section (3)" and all other processes (i.e., "receiving, warehousing, logistics, inventory managements, fulfilment to Customer, reporting, VAS (as defined below)[,] and third[-]party transportation management services") required of CTDI throughout the VMIA. (*See* Dkt. No. 294-22 at 17–21). Thus, Google gives interim instructions and retains the right of interim control over every step of each service.

13

Google contends that it has no interim control over CTDI. (Dkt. No. 255 at 19; Dkt. No. 320 at 8). Google compares provisions between the Google-CTDI agreements and *In re Volkswagen*:

- Google specifies the boundaries of the Google Secured Area and the requirements to include badges and cameras; however, Google contends that this is similar to car dealers that "use specified tools when performing warranty and maintenance work" and "use distributor-approved computer hardware and software." (Dkt. No. 320 at 9 (quoting *In re Volkswagen*, 28 F.4th at 1203)).
- "Provisions defining for CTDI which devices qualify for warranty repair are equivalent to requirements on car dealers to 'perform warranty work on consumer vehicles.'" (*Id.*).
- "CTDI's obligation to use Google branding and packaging is equivalent to requirements on car dealers to 'comply with the distributors' standards regarding dealership appearance and use of signs and brand logos.'" (*Id.*).
- "CTDI's obligation to report on its activities is similar to requirements of car dealers to 'provide[s] sales reports.'" (*Id.*).
- Google also argues that the dealership agreements were more onerous than the Google-CTDI agreements, including requirements that the dealers 'employ certain types of employees,' 'maintain a minimum amount of inventory,' meet 'working capital requirements,' 'attend mandatory training sessions[,]' and obtain 'certain training certifications.'" (*Id.*).

Google selectively identifies certain contractual provisions that set constraints on CTDI; however, Google makes no mention of the interim instructions throughout the Google-CTDI agreements. In light of Google's step-by-step instructions, the constraints that Google imposes are indicative of Google's interim control over CTDI. Not only does Google sequentially detail each step of every service that CTDI must provide for Google, but Google also sets compliance standards by which CTDI must carry out those services. Such so-called constraints noted by Google are guardrails in order for CTDI to follow Google's interim instructions.

Google argues that CTDI lacks the "authority to 'alter the legal relations between the principal and third persons.'" (Case No. 2:19-cv-361, Dkt. No. 255 at 17; Dkt. No. 320 at 7). Google emphasizes that the foregoing is "an essential characteristic of an agency [relationship]."

14

(Dkt. No. 255 at 17 (citing *U.S. v. Schaltenbrand*, 930 F.2d 1554, 1560 (11th Cir. 1991); *Griffin v. U.S.*, 588 F.2d 521, 528–29 (5th Cir. 1979)))). An agent's authority to alter legal relations is not the standard that the Federal Circuit employed to determine venue. *See In re Google*, 949 F.3d at 1345 ("[t]he essential elements of agency are (1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act.").

Google then argues that CTDI lacks the "authority to accept service of process on Google's behalf." (Dkt. No. 255 at 23; Dkt. No. 320 at 7). In support, Google argues that "*In re Google* confirmed that 'the venue and service provisions were not just enacted together but expressly linked, and both have always required that the defendant have a "regular and established place of business."'" (Dkt. No. 255 at 23 (quoting *In re Google* 949 F.3d at 1344)). Google misunderstands *In re Google*. The Federal Circuit interpreted the phrase "regular and established place of business" to stand for "the regular, physical presence of an agent at the place of business" based on analyzing language from the service and venue statutes. *In re Google*, 949 F.3d at 1344. The Court does not read the Federal Circuit's holding to impute a service of process requirement for purposes of its test in determining venue.

Google argues that CTDI is not Google's agent because CTDI's repair activities are ancillary to Google's business. (Dkt. No. 255 at 22). Google considers *In re Google* to be instructive because "'maintenance activities' that third-party ISPs preformed for computer servers 'cannot, standing alone, be considered the conduct of Google's business.'" (*Id.* (citing *In re Google*, 949 at F.3d at 1346)). The Court disagrees with Google's assessment of *In re Google*.

15

In determining what constitutes "conducting business," the Federal Circuit concluded that "activities, such as maintenance, that are merely connected to, but do not themselves constitute the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods and services" should be excluded from consideration under the venue statute. *In re Google*, 949 F.3d at 1347. The Federal Circuit found that the maintenance activities in *In re Google* were ancillary to Google's primary business of providing online search engine services through the servers because the maintenance activities were not actually Google's primary business. In this case, the "maintenance activities" contemplated in the SOW, ISA, and VMIA are Google's "conduct of business." For example, Google requires that CTDI provide repairing, refurbishing, and warehousing services for Google devices, and such activities actually constitute Google's business.[7] Repairing, refurbishing, and/or replacing damaged or defective Google devices purchased and delivered by Google's retail customers is integral to the "exchange of goods and services" as the Federal Circuit specified in *In re Google*. This is not, as Google argues, equivalent to a technician periodically walking through a remote server site to make sure node servers and equipment are maintained as intended.

Google contends that under *In re Volkswagen*, "no-agency clauses are probative of the absence of an agency relationship." (Dkt. No. 320 at 4). Google heavily relies on its no-agency clause, which disclaims an agency relationship. The Federal Circuit held that its finding of no agency was supported by contractual disclaimers of agency; however, the Federal Circuit was careful to note that such clauses were not dispositive. *See In re Volkswagen*, 28 F.4th at 1212

---

[7] Google's repairing services are central to the SOW. CTDI receives Google devices from customers and provides shipping and warehousing services for Google devices that need repaired. (*See* Dkt. No. 294-13 at §§ 6.3(A), 6.5, 6.9(B)). CTDI then ships the repaired devices back to Google's customers. (*See id.* at § 6.12). As discussed below, Google holds itself out as *directly* performing repairing and refurbishing services for its customers at the Flower Mound Facility—thus, the Court rejects Google's argument that CTDI's services are merely ancillary to Google's business.

16

("Our holding is further bolstered by the relevant—though not dispositive—consideration that the parties to the franchise agreements disclaim an agency relationship."). Similarly, the Court concludes that no-agency clauses are not dispositive as to the determination of CTDI and Google's agency relationship. Based on the foregoing, the Court finds that Google and CTDI's agency relationship satisfies the second *Cray* factor.

### C. Place of the Defendant

Under the third *Cray* factor, "'the regular and established place of business' must be 'the place of the defendant.'" *In re Cray*, 871 F.3d at 1363. To be the place of the defendant, "the defendant must establish or ratify the place of business." *Id.* A court may consider "whether the defendant owns or leases the place"; "exercises other attributes of possession or control over the place"; "[m]arketing or advertisements . . . but only to the extent they indicate that the defendant itself holds out a place for its business"; "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory"; or whether the defendant "places its name on a sign associated with or on the building itself." *Id.* at 1363–64. However, the Federal Circuit stated that "the mere fact that a defendant has advertised that it has a place of business or has even set up an office is not sufficient." *Id.* at 1364.

Google argues that the Flower Mound Facility is not a place "of Google" because it is owned and operated by CTDI. (Dkt. No. 255 at 24). Google continues that it does not ratify the Flower Mound Facility as its place of business merely because it tells customers to ship devices to CTDI's Flower Mound address using Google-branded labeling. (*Id.* (citations omitted)). Google then argues that temporary storage of customer-owned products for repair at the Flower Mound Facility does not confer venue because "the defendant 'must exercise[] possession or control over' the third party's business location; the mere *use* of that location is insufficient." (*Id.* (collecting cases)). Finally, Google argues that the Google Secured Area is insufficient to establish venue because, like the

17

Samsung Experience Shops in *Int'l Techs. & Sys. Corp. v. Samsung Elecs. Co. Ltd.*, Google similarly does not "own or lease any offices or facilities or have any employees that work[ed] at the Samsung Experience Shops."  (*Id.* at 26 (citing No. SA CV 17-1748-DOC (JDEx), 2018 WL 4963129, at *8 (C.D. Cal. June 22, 2018))).

AGIS responds that the third *Cray* factor is satisfied because the Flower Mound Facility is "of Google."  (Dkt. No. 294 at 26).  AGIS relies on this Court's decision in *PMC* and contends that "[t]he [*PMC*] Court found that Google establishes and ratifies the Flower Mound Facility as its place of business and that Google acts purposefully to make Google's customers believe they are sending their Google devices to Google to be repaired."  (*Id.* at 27).

Here, Google holds the Flower Mound Facility out as its place of business because it exercises interim control over the CTDI's activities and holds out to the public that Google's repairing services are being performed at the Flower Mound Facility.  (*See, e.g.*, Dkt. No. 294-13 at § 6.2).  Within the Google Secured Area, Google has absolute control over CTDI's conduct.  (*See id.* at 5).  As previously detailed under the second *Cray* factor, Google does not merely use the Flower Mound Facility but controls all aspects of CTDI's conduct as it pertains to Google's exclusive and restrictive Google Secured Area.

Further, on its website, Google advertises to its customers that it is the provider of repairs for all Pixel phones (Dkt. No. 294-14) while CTDI—acting behind the scenes—receives and repairs products for Google's customers.  (Dkt. No. 255 at 13).  "Google handles all customer interactions itself[,]" and "[c]ustomers do not interact with CTDI employees."  (*Id.*).  Shipping labels and packaging used for repairs have Google logos, but nothing identifies CTDI.  (Dkt. No. 255 at 13; Dkt. No. 256-1 at 254:3–256:13; Dkt. No. 294-13 at §§ 6.5, 6.10, 6.12).  Indeed, by Google's own admission, "[Customers] are not even aware of CTDI."  (Dkt. No. 255 at 13).  Taken together, Google's defined space in the Google Secured Area, Google's control over CTDI, and Google's

marketing initiatives as the provider of services and point of contact for customers, is sufficient to satisfy the third *Cray* factor. Google essentially subsumes CTDI in every respect. Accordingly, the Court concludes that Google has ratified CTDI as its place of business.

In sum, AGIS has established all three factors under *Cray*, and the Court concludes that venue is proper as to Google in the EDTX.

## IV. CONCLUSION

For the reasons stated herein, Google's Motion should be and hereby is **DENIED**.

**So ORDERED and SIGNED this 12th day of May, 2022.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE